IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

JENNIFER M. SMITH

                Plaintiff,                 Civil No. 04-6226-HA

           v.                     OPINION
                                     AND ORDER

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

                Defendant.
_____

Kathryn Tassinari
Brent Wells
Cram, Harder, Wells & Baron, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401
        Attorneys for Plaintiff

1 - OPINION AND ORDER

Karin J. Immergut
United States Attorney
Craig J. Casey
Assistant United States Attorney
1000 S.W. Third Avenue
Portland, Oregon 97204

Lucille G. Meis
Regional Chief Counsel
Office of General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, Washington 98104
        Attorneys for Defendant

_____

HAGGERTY, Chief Judge:

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB). Plaintiff argues that the administrative law judge (ALJ) erred by failing to credit the opinions of Dr. Rhonda N. Simpson, M.D., plaintiff's treating physician; Lance Weinberg, a mental health therapist; and the lay testimony of Elenor Meagher, plaintiff's grandmother. She also argues the ALJ erred in failing to credit her own testimony. For the reasons that follow, the Commissioner's decision is affirmed.

## ADMINISTRATIVE HISTORY

Plaintiff applied for DIB on September 24, 2002. AR 57. She alleged disability due to bipolar disorder, fibromyalgia, chronic fatigue, irritable bowel syndrome (IBS), asthma, immune deficiency, chronic migraine disorder, Raynaud's syndrome, and uncontrollable mood swings. AR 15. She alleged an onset date of October 31, 2001. AR 57. Denied initially and upon reconsideration, plaintiff requested a hearing. AR 51. A hearing before

ALJ James M. Caulfield was held on September 9, 2003. AR 448-505. Present were plaintiff, plaintiff's attorney, and Jeffrey F. Tittlefitz, a vocational expert (VE). The ALJ issued an unfavorable decision on January 30, 2004. AR 11-22. The Appeals Council denied plaintiff's request for review, making the ALJ's opinion the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 422.210; *Russell v. Bowen*, 856 F.2d 81, 83-84 (9th Cir. 1988).

**FACTUAL HISTORY**

Plaintiff was twenty-six years old at the time of the hearing. AR 457. She received her GED when she was sixteen years old, and then attended almost two years of community college. AR 461. During college, she worked as a clerical assistant ten to fifteen hours a week until May 2002. AR 465. Her past relevant work includes employment as an adult care provider, housekeeper, floor clerk, courier, restaurant assistant and manager, and employee trainer. AR 466-69.

Relevant Medical History

On March 14, 2001, plaintiff reported to Dr. Simpson with complaints of a urinary tract infection and a cough. AR 198. She also complained of extreme fatigue, and that her hands get numb and tingly with repetitive movement. *Id.* Dr. Simpson diagnosed plaintiff with possible carpal tunnel syndrome, history of hyperglycemia, fatigue, and bronchitis. *Id.*

On April 6, 2001, plaintiff presented to Linn County Mental Health for mood swings and trouble sleeping. AR 252. She said she had a history of depression and wanted to learn how to better deal with stress. *Id.* At that time, plaintiff was attending school full time and

working forty to forty-five hours per week as a housekeeper. *Id.* She complained of asthma, migraines, and a bad back. *Id.* A staff representative diagnosed plaintiff with major depressive disorder. *Id.* Two weeks later, plaintiff told Dr. Simpson that she was still fatigued, and was only getting about three to four hours of sleep per night. AR 196. Shortly thereafter, on April 26, 2001, plaintiff was evaluated by Penny Stute (Stute), a psychiatric mental health nurse practitioner. AR 249. Plaintiff reported that school was the biggest stressor for her, and indicated that she would like to decrease her credit hours, but that she would lose her financial aid if she did so. AR 250. Plaintiff also reported that she did not feel nauseous, was not vomiting, that she sleeps three to six hours per night, but sometimes becomes very energetic and does not sleep for days. *Id.* Stute diagnosed plaintiff with major depressive disorder and post traumatic stress disorder. AR 251. Stute also noted that sources of stress in plaintiff's life were single parenthood and inadequate finances. *Id.* Stute prescribed Effexor for plaintiff's depression and Sonata to help her sleep. *Id.*

On September 21, 2001, plaintiff was discharged from treatment at Linn County Mental Health. AR 239. Joe Reilly, therapist, wrote on plaintiff's discharge summary that plaintiff "appeared to be coping much better with a very high level of stress in her life. Medication helped her to obtain more sleep, and so she had more energy to work." *Id.*

On November 7, 2001, plaintiff was examined by Dr. Linda Peel, an internist. AR 190. Plaintiff complained of constipation, stomach cramps, nausea, vomiting, and feverish chills. *Id.* Dr. Peel noted that plaintiff walked daily but performed no additional exercise. *Id.*

Dr. Terrance A. Hill, M.D., treated plaintiff on January 4, 2002, for constipation. AR 149. Dr. Hill performed a colonscopy and found it unremarkable, and found no evidence of any polyps, tumors, obstruction, colitis, or Chron disease. *Id.* On March 25, 2002, plaintiff was treated for worsening mood swings. AR 187. The chart notes indicate that plaintiff reported sleep problems, irritability, and fatigue. *Id.* Plaintiff also reported that she was working, studying, and caring for her son. Plaintiff was referred for counseling. *Id.*

On May 22, 2002, plaintiff presented to Dr. Simpson with complaints of tremors, fatigue, and migraines. AR 185. Plaintiff reported that she was no longer working due to a combination of trying to go back to school and fatigue. *Id.* Plaintiff stated that she had been on Effexor for four years to help treat her depression, and indicated that it did help control her depression "quite well." *Id.* Dr. Simpson noted that although plaintiff had a very fine tremor, her coordination was good, she retained maximum strength in all extremities, and the examination was otherwise "normal." *Id.*

On May 28, 2002, plaintiff was examined by Lance Weinberg (Weinberg), a mental health counselor. AR 246. Plaintiff complained that her medications were no longer working, her mood swings were more severe, and she was generally feeling depressed. *Id.* She reported that her sleep was erratic, and that on days that she felt good, she was task oriented and productive. *Id.* Plaintiff also indicated that she was in school, majoring in psychology. AR 248. Weinberg diagnosed plaintiff with hypomania and depression. *Id.*

The following month, on June 21, 2002, Dr. David Gowing, M.D., a psychiatrist, examined plaintiff. AR 234. Plaintiff indicated that she experienced mood swings with a

hyper component in which she has excessive energy, does unnecessary house work, and has trouble sleeping. *Id.* Dr. Gowing diagnosed plaintiff with major depressive disorder and post traumatic stress disorder, and suggested that bipolar disorder may also be an appropriate diagnosis. *Id.* Dr. Gowing prescribed Depakote, Effexor, and Dalmane to treat plaintiff's depression and insomnia. *Id.* One month later, plaintiff returned to Dr. Gowing for a follow-up appointment. AR 233. Plaintiff reported that she was doing better and that she was "very pleased" with the results of the Depakote. *Id.* On a scale of 0-10, plaintiff rated her mood as an "8." *Id.* She indicated that she was sleeping better and that her migraines were controlled by the medication. *Id.* She also indicated that she wanted to be referred back to Dr. Simpson and that she was not interested in therapy. *Id.* Dr. Gowing revised his previous diagnosis of major depressive disorder to bipolar II disorder and post traumatic stress disorder. *Id.* Dr. Gowing wrote that plaintiff may benefit in the future by a moderate increase in the Depakote to control her mood swings. *Id.* Dr. Gowing referred plaintiff back to Dr. Simpson. *Id.*

On August 26, 2002, plaintiff was examined by Dr. Sydney Piercey, a neurologist. AR 174. Plaintiff complained of persistent tremors and weakness in her legs that caused her to fall. *Id.* Plaintiff stated that she was not experiencing any bowel or bladder problems. *Id.* Plaintiff also stated that she has suffered from migraine disorder for the past fifteen years, but that it had "improved significantly" since she began taking Depakote. *Id.* She reported that she had bipolar disorder, but that it was controlled. *Id.* Plaintiff also reported that she was a student. AR 175. Dr. Piercey assessed plaintiff with a benign essential tremor, made worse

with anxiety, and possibly exacerbated by the Effexor and Depakote. *Id.* Dr. Piercey attributed plaintiff's falls and dropping items out of her hand to the tremors. *Id.*

On September 26, 2002, plaintiff met with Weinberg. AR 232. She indicated that she was still suffering from insomnia, and that she had been given a prescription to help her sleep but was not taking it. AR 232. She rated her mood as a "7." *Id.*

Plaintiff returned to Dr. Piercey on October 21, 2002. AR 297. She stated that she had begun taking Topomax in place of Depakote to help alleviate the tremors, and that it was helping. *Id.*

Three days later, plaintiff again met with Weinberg. AR 303. She stated that she was sleeping better at night and that her tremors were coming under control. *Id.*

Dr. Piercey reported on November 18, 2002, that an MRI scan and an EEG both performed in late October 2002 were normal and unremarkable. AR 438. Dr. Piercey noted that plaintiff's tremor and migraine disorder were both improving with the Topomax. *Id.* Dr. Piercey also suggested that plaintiff's tremor spells may be secondary to anxiety. *Id.*

On November 21, 2002, plaintiff met with Weinberg and stated that she "has a very full time job in caring for her child and gets little support from the family." AR 301. Weinberg noted that the Topomax was "clearly helping" the tremor and insomnia. *Id.*

Dr. Simpson examined plaintiff on November 27, 2002. AR 285. Plaintiff complained of continued problems with insomnia and mood disorder. *Id.* She also stated that she is "very angry" with her mother and felt that her mood disorder was starting to escape control. *Id.* Dr. Simpson referred plaintiff to a psychiatrist. *Id.*

On January 7, 2003, Weinberg wrote a letter to the Department of Human Services, stating that plaintiff continued to struggle with depression, and attributed her migraine headaches to stress. AR 300. The next day, plaintiff met with Dr. Simpson for a follow-up appointment and complained of back pain and fatigue. AR 348. Plaintiff indicated that the Topomax was helping with the tremors, but that she continued to be very depressed and tired. *Id.* She stated that she was unable to sleep for more than a couple hours at a time and was constantly taking naps. *Id.*

On January 16, 2003, plaintiff met with Weinberg and stated that she was very upset because it looked like her house was going into foreclosure. AR 335. She stated that she was not sleeping well and was very nervous and upset. *Id.*

On February 12, 2003, Dr. Simpson treated plaintiff for fatigue and depression. AR 347. Plaintiff expressed continued anger with her mother. *Id.* Dr. Simpson spent thirty minutes with plaintiff, discussing proper diet, exercise, and structure in her life. *Id.*

Dr. Piercey examined plaintiff on March 10, 2003. AR 437. Dr. Piercey noted that plaintiff's spells of inattentiveness "have improved significantly," and that overall, she was "doing well." *Id.* Dr. Piercey also noted that although plaintiff continued to suffer from headaches, the Topomax was helping. *Id.*

Robert Vandiver, M.D., treated plaintiff on March 13, 2003, for complaints of stress. AR 334. Plaintiff related how she had been very stressed lately due to moving and taking care of her child. *Id.* She was unable to tell whether or not her affected mood was due to

these stressors or was a side effect from medication.  *Id.*  Dr. Vandiver increased the Topomax dosage pursuant to Dr. Piercey's request.  *Id.*

The next day, plaintiff was examined by a nurse practitioner at Dr. Simpson's office. AR 345.  Plaintiff complained of severe exhaustion, depression, and mild nausea.  *Id.*  She indicated that she was moving to a travel trailer in her mother's backyard because her grandmother's house was going into foreclosure.  *Id.*  She stated that she was applying for disability.  *Id.*  She also stated that she was experiencing intermittent back pain without limitation to mobility.  *Id.*

Dr. Vandiver treated plaintiff on April 17, 2003, for continued stress.  AR 333. Plaintiff expressed "strong feelings" about moving in her with her mother and her mother's boyfriend.  *Id.*  Dr. Vandiver noted that plaintiff appeared stable on the medications and did not appear as upset as she used to be, although it was apparent that she was stressed.  *Id.*

On May 13, 2003, plaintiff was treated for severe abdominal bloating, flatulence, and mild nausea.  AR 343.  She reported she was in distress due to the abdominal gas and increased family dynamic stress.  *Id.*  She was diagnosed with dyspepsia/IBS.  *Id.*

Dr. Hill treated plaintiff on July 24, 2003, for complaints of heartburn and IBS.  AR 373.  Plaintiff complained of acid reflux, intermittent nausea and vomiting, and bloating.  *Id.* Dr. Hill assessed plaintiff with acid reflux and IBS.  *Id.*  On July 28, 2003, Dr. Hill wrote a letter addressed to plaintiff, stating that "[b]iopsies from the lower part of the stomach confirmed superficial mucosal erosions with chronic gastritis."  *Id.*  Dr. Hill indicated that the

gastritis was most likely autoimmune, aggravated by plaintiff's use of Aleve and ibuprofen. *Id.*

Dr. Piercey noted on July 30, 2003, that plaintiff was under much stress because she had to move in with her mother and for financial reasons. AR 436. Dr. Piercey also noted that plaintiff was not at all tremulous, and indicated that plaintiff's migraine headache disorder had improved with the Topomax. *Id.*

In a letter dated August 22, 2003, Dr. Simpson wrote to plaintiff's attorney that her clinic had been treating plaintiff on an as-needed basis since 1992. AR 444. She wrote that lately, plaintiff had presented to the clinic about every four to six weeks, and had been treated for IBS, bipolar disorder, and endometriosis. *Id.* Dr. Simpson indicated that as a result of plaintiff's bipolar disorder and post traumatic stress disorder, she had been edgy and irritable, and that she "would have difficulty functioning in a work setting especially working with the public with her Bipolar Disorder which is only marginally controlled at this time . . . . [and] that she would have difficulty coping with criticism of supervisors." *Id.* Dr. Simpson opined that due to plaintiff's fatigue, she would have difficulty working full time without excessive absences. *Id.*

Dr. Simpson's letter was followed by a letter from Weinberg to plaintiff's attorney. AR 447. Weinberg stated that plaintiff suffered from bipolar disorder, she had difficulty sleeping, concentrating, and handling stress. *Id.* Weinberg stated that his "assumptions with [plaintiff's] work ability are along the lines [plaintiff's attorney] mentioned in [his] letter." *Id.* Weinberg agreed with plaintiff's attorney and the apparent language set out by plaintiff's

attorney that plaintiff may be able to handle "a simple, routine, low stress job that does not require her to come into contact with the public nor work in close coordination with supervisors or co-workers." *Id.* Weinberg also stated that it was "doubtful whether [plaintiff] could avoid work absences in excess of two days per month, or handle a full-time schedule." *Id.*

Plaintiff's Testimony

At the hearing, plaintiff testified that for the last two years, she had been unable to stand for more than ten minutes at a time before her back starts to hurt and her feet swell. AR 476, 479. She cannot sit for more than twenty to thirty minutes due to hip and back pain and bloating in her stomach. AR 476-77. She can walk up to fifteen minutes before she experiences pain in her hip, lower back, and feet. AR 479. She cannot lift a twenty-five pound bag of groceries without significant pain. *Id.*

When plaintiff was attending college, she took full course loads. AR 484. She stopped taking classes mid-semester in the summer of 2002, AR 484-85, when she began getting tremors, migraines, persistent mood swings, and was unable to keep up in her classes. *Id.* She testified that medication helped with the mood swings, but that she had to stop taking them in April 2003 for financial reasons. AR 486-87. Her migraines have increased in frequency from two to three times a month to two to three times a day. AR 488. She takes medication regularly to help them go away. *Id.* With the help of medication, the tremors have mostly subsided. AR 489.

Plaintiff testified that she feels tired most of the day and that it prevents her from playing with her son. AR 490. However, she also testified that she spends most of the day with her son, watching television and playing computer games with him. AR 482-83. She stated that her grandmother takes care of the family, bathes her son, drives him to preschool, makes the meals, and does all of the housework. AR 457-58, 481. Plaintiff also stated that she suffers from abdominal pain, constipation, and diarrhea, and must go to the bathroom once every hour. AR 491.

Elenor Meagher's Testimony

Plaintiff's grandmother, Elenor Meagher (Meagher), submitted two written statements to the ALJ in lieu of testifying. AR 133. In a statement dated October 12, 2002, Meagher stated that she saw plaintiff twenty-four hours per day, plaintiff cannot "be out of bed for any time," yet she takes daily walks for fifteen minutes at a time for exercise, and regularly watches television and uses the computer. Plaintiff has trouble sleeping, but the medication helps. She sleeps most of the day, and is only awake for about one to two hours per day. Yet, Meagher also stated that plaintiff watches television for three hours per day and uses the computer for one half hour each day. Meagher completed the statement by writing that plaintiff "is not getting any better. She is slower get worst [sic]. And then there day [sic] she has day when she can't get out of bed because of the pain." AR 96-107. In a letter dated September 2003, Meagher wrote that plaintiff slept most of the day, and was frequently bothered by migraine headaches and stomach pain. AR 137.

//

<u>Vocational Expert Testimony</u>

The ALJ posed the following hypothetical question to the VE: a twenty-six-year-old female with a high school education and two years of college who must avoid moderate exposure to pulmonary irritants, is moderately limited with fine finger manipulation and interaction with the general public; is able to carry out and understand simple job instructions and can interact with co-workers and supervisors; and is able to adapt to changes in the work place. AR 502. The VE responded that such an individual could perform plaintiff's past relevant work as a mail clerk and checker. *Id.* Such an individual could also be employed as a packing line worker. *Id.*

The ALJ posed a second hypothetical question to the VE: a similar individual who cannot stand more than ten minutes, cannot sit longer than twenty to thirty minutes, cannot walk for more than fifteen minutes, and cannot lift a twenty-pound bag of groceries without significant pain. AR 503. The VE testified that such an individual could not perform any of plaintiff's past relevant work. *Id.*

## **STANDARDS**

A claimant is disabled for purposes of the Social Security Act (the Act) if he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). A person can be disabled for these purposes only if his or her impairment is so severe that he or she "is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for DIB.  20 C.F.R. § 404.1520; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Below is a summary of the five steps:

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If the claimant is not working in a substantially gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment.  Therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the

regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

When a determination of disability cannot be made at any of the first three Steps, the Commissioner then determines the claimant's residual functioning capacity (RFC), which is what the claimant can still do despite his or her limitations. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1; 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

<u>Step Four</u>. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. If so, the claimant is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds to Step Five. 20 C.F.R. § 404.1520(e).

<u>Step Five</u>. The Commissioner determines whether the claimant is able to do any other work. If not, the claimant is disabled. If the Commissioner finds the claimant is able to perform other work, the Commissioner must determine the existence of a significant number of jobs in the national economy that the claimant can perform. The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1); *see also Tackett*, 180 F.3d at 1099.

The burden of proof is on the claimant as to Steps One through Four. *Tackett*, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

The Commissioner has an affirmative duty to develop the record. 20 C.F.R. § 404.1512(d); *DeLorme*, 924 F.2d at 849. In that sense, the proceedings are not adversarial, and the Commissioner shares the burden of proof at all stages. *Id.*; *Tackett,* 180 F.3d at 1098 n.3.

The Commissioner's findings as to any fact, if supported by substantial evidence, is conclusive. 42 U.S.C. § 405(g). The district court must affirm the findings of fact as long as they are supported by "substantial evidence" and if the proper legal standards were applied. *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence" is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990).

Whether substantial evidence supports a finding is ascertained by reviewing the record as a whole, with the court weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. *Sandgathe*, 108 F.3d at 980. When the evidence can rationally be interpreted in differing ways, the district court must uphold the Commissioner's decision. *Id.* The Commissioner, not the reviewing court, must resolve conflicts in the evidence, and the Commissioner's decision must be upheld even if the evidence would support either outcome. *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1998).

## **ANALYSIS**

At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date on October 31, 2001. AR 15, 21. At Step

Two, the ALJ found that plaintiff's fibromyalgia, asthma, headaches, depresssion, and mood swings or bipolar disorder were severe impairments. AR 16, 21. However, at Step Three, the ALJ found that these impairments did not meet or equal the requirements of a listed impairment, either singly or in combination. *Id.* The ALJ determined that plaintiff retained the RFC for light exertion work. AR 21. She is moderately limited in fine finger manipulation, she must avoid moderate exposure to pulmonary irritants, and she is moderately limited in her interaction with the public. The ALJ found that plaintiff had the capacity to understand, remember, and carry out simple job instructions. *Id.* At Step Four, the ALJ found that plaintiff could perform her past relevant work as a mail clerk or checker. *Id.* At Step Five, with the aid of the VE, the ALJ determined that plaintiff could also perform other work that existed in significant numbers in the national economy, such as a packing line worker or a marker II. *Id.*

Plaintiff argues that the ALJ erred by improperly rejecting (1) her testimony, (2) the medical opinion of Dr. Simpson, (3) Weinberg's opinion, and (4) Meagher's lay witness testimony.

Plaintiff's Testimony

Plaintiff testified that she suffered from stomach problems, weakness, fatigue, concentration difficulties, and dramatic mood swings. She stated that medication had helped with her mood swings prior to moving in with her mother in April 2003. After that, she experienced migraine headaches a few times a week. Medication also helped to alleviate these headaches, but she still had to lay down several hours during the day. She testified she

was only able to stand ten minutes at a time before she experienced back pain and her feet would swell. She was limited to sitting twenty to thirty minutes at a time due to hip and back pain and stomach problems. She could not lift twenty-five pounds without causing back pain and headaches.

After a claimant produces objective medical evidence of an underlying impairment, and there is no evidence of malingering, the ALJ may reject a claimant's testimony only by providing specific, clear, and convincing reasons, supported by substantial evidence in the record. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citation omitted). The proffered reasons must be adequately specific to permit a reviewing court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit it. *Id.* at 856-57 (citation omitted). In gauging the credibility of a claimant's testimony, the ALJ may employ ordinary techniques of credibility evaluation, such as the nature, onset, duration, and intensity of pain; precipitating and aggravating factors; effectiveness and adverse side-effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; and the claimant's daily activities. SSR 95-5p (1995).

Here, the ALJ articulated sufficient reasons for rejecting plaintiff's testimony. Plaintiff alleged disability since October 2001, yet attended school full-time and worked up to fifteen hours a week through May 2002. She quit working because of fatigue and because she was trying to go back to school. She continued taking classes through August 2002. She stopped mental health treatment in September 2001, citing improved energy level and ability

to cope with stress.  Medical records reveal that plaintiff's condition deteriorated in the spring of 2002, but improved significantly by that summer with the help of medication.  Plaintiff reported that she was very pleased with the medications and declined further therapy treatment.

Plaintiff testified that she slept all day and was always tired, yet she was able to find time to attend group therapy sessions, and stated that she spent most of the day caring for her son, watching television and playing games on the computer with him.  She testified that her grandmother played a significant role in caring for her son by bathing him daily and driving him to and from preschool.  Yet, in November 2002, she reported that caring for her son was a full-time job and that she was unhappy with the level of support she was getting from her family.  By spring 2003, plaintiff reported feeling much better and felt that her tremors, headaches, and insomnia were under control with the help of medication.  She indicated that she was still stressed, but suggested that it may be attributed to an erratic and frustrating home life and difficulty with finances.

The court is satisfied that the ALJ set forth clear and convincing reasons supported by sufficient evidence in the record to find plaintiff's testimony less than credible.

Dr. Simpson's Medical Opinion

Dr. Simpson opined that plaintiff's conditions caused her fatigue, abdominal pain, irritability, and mood swings such that she would have difficulty functioning in a work setting, especially interacting with the public.  Her fatigue would cause difficulty in working

a full-time work schedule without excessive absences. Her excessive irritability would make it difficult for her to cope with criticism from supervisors.

The uncontroverted medical opinion of a treating physician may not be rejected by the ALJ absent clear and convincing reasons supported by substantial evidence in the record. *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

Dr. Simpson is plaintiff's internist and treated her for heartburn and IBS. She opined that plaintiff's heartburn was likely secondary to her use of Aleve and Ibuprofen. She advised plaintiff to discontinue or reduce her use of these medications. She found no acute inflammation and her chronic gastritis was mild. Yet, Dr. Simpson opined that these conditions, in combination with plaintiff's mental disorders, would prevent plaintiff from performing full-time work. The ALJ found that although Dr. Simpson was qualified as a treating physician to render a psychiatric opinion, it was outside her area of expertise. The ALJ determined that Dr. Simpson's opinion that plaintiff would be unable to perform full-time work was based in large part on her perception of plaintiff's mental illness, an area in which Dr. Simpson had not primarily treated plaintiff.

Review of the medical records regarding plaintiff's mental health reveal that plaintiff voluntarily terminated treatment in September 2001 and indicated that her energy level was up and that her coping skills had improved. In May 2002, she suggested that one of the reasons she quit working was because she wanted to go back to school. In August 2002, Dr. Piercey's chart notes indicate that plaintiff's migraine headaches and bipolar disorder were

under control by the medication.  In September 2002, plaintiff appeared generally positive and rated her mood as a "7."  In March 2003, plaintiff related how she had been very stressed as of late due to moving in with her mother and caring for her son.  She was unable to tell whether or not her depressed mood was due to these stressors or was a side-effect of any medication.  In July 2003, she stated that she was stressed by her living situation and financial difficulties.  The following month, Dr. Simpson wrote the aforementioned letter opining that plaintiff would be unable to work, due in part to her mental disorders.

Mindful that it is the ALJ who is responsible for resolving ambiguities and conflicts in the record, *Frost v. Barnhart*, 314 F.3d 359, 369 (9th Cir. 2002) (citing *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001), the court finds that the ALJ provided clear and convincing reasons for rejecting Dr. Simpson's opinion.

<u>Weinberg's and Meagher's Statements</u>

Weinberg was plaintiff's treating mental health therapist.  He does not qualify as an "acceptable medical source" to establish whether a claimant has a medically determinable impairment.  20 C.F.R. § 404.1513 ("acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists and podiatrists, and qualified speech-language pathologists).  Accordingly, his statement is accorded the same weight as a lay witness opinion.  To discount the testimony of a lay witness, an ALJ must articulate reasons that are germane to each witness.  *Merrill ex rel. v. Merrill v. Apfel*, 224 F.3d 1083, 1086 (9th Cir. 2000) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

In September 2003, Weinberg opined that plaintiff may be able to handle a simple, routine, low-stress job that did not require her to interact with the public or work closely with supervisors or coworkers, but that she would not be able to work full time due to absences in excess of two days per month. The ALJ rejected this statement, finding that Weinberg was apparently parroting language presented to him by plaintiff's attorney.

"Although courts have upheld the use of lay testimony in some instances . . . it is not the equivalent of medically acceptable . . . diagnostic techniques that are ordinarily relied upon to establish a disability." *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (internal citations and quotation marks omitted) (finding that the ALJ properly discounted lay testimony that conflicted with available medical evidence). While the court is not convinced that the ALJ's proffered reason for rejecting Weinberg's statement meets the standard for discounting lay testimony, the court is nonetheless satisfied that Weinberg's opinion contradicts other acceptable medical evidence and that it was appropriate for the ALJ to discredit Weinberg's statement for this reason. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990) and *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1984)) (applying the harmless error standard where substantial evidence otherwise supports the ALJ's decision).

Similarly, the statements submitted by Meagher, plaintiff's grandmother, should be treated as an opinion by a lay witness. As noted above, an ALJ may properly reject lay witness testimony that is internally inconsistent or otherwise contradicts medical evidence.

In rejecting Meagher's September 2003 letter, the ALJ noted that Meagher provided extensive testimony about plaintiff's daily activities and limitations, yet, at the time of the letter, plaintiff had moved in with her mother and had not been living with Meagher for nearly six months. Moreover, Meagher's statements conflicted with medical evidence regarding plaintiff's condition, such as chart notes from Weinberg, Drs. Gowing and Vandiver, as well as plaintiff's own statements about how her condition was improving. The ALJ properly rejected Meagher's statements.

## CONCLUSION

Based upon the foregoing, the court finds that the Commissioner's decision is supported by substantial evidence in the record and is free from legal error. Accordingly, the decision of the Commissioner is AFFIRMED. This case is DISMISSED with prejudice.

IT IS SO ORDERED.

DATED this ___15__ day of July, 2005.


_____/s/Ancer L.Haggerty_____
            Ancer L. Haggerty
        United States District Judge